UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LATIA TUNSTALL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-cv-00810-JRS-TAB |
| | ) |
| DSG MISSOURI, LLC, | ) |
| | ) |
| Defendant. | ) |

**Order on Defendant's Motion for Summary Judgment (ECF No. 44)**

Plaintiff Latia Tunstall ("Tunstall") alleges claims against Defendant DSG Missouri, LLC ("DSG"), for discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Compl. ¶ 17, ECF No. 1.)  Specifically, Tunstall alleges that DSG, by terminating and failing to hire her at its furniture distribution warehouse, discriminated against her based on her gender. (*Id.* ¶¶ 5-15.)  Defendant now moves for summary judgment. (ECF No. 44.)  For the following reasons, Defendant DSG's Motion for Summary Judgment is **denied in part** and **granted in part**.

## I. Background

Construing all facts and reasonable inferences in the light most favorable to Tunstall, the pertinent, uncontroverted summary judgment evidence is as follows.

DSG owns and operates an Ashley Furniture Warehouse (the "warehouse") in Plainfield, Indiana. (Williams Dep. Tr. 55:1-7, ECF No. 51-3.)  Kelly Services is a temporary staffing company that hires temporary employees to work at DSG's warehouse. (Def.'s Resp. to ICRC Compl. at 1, ECF No. 51-5.)  On June 17, 2015, DSG

employee Yael Canela emailed Amy Rector, DSG's contact at Kelly Services, and requested temporary employees to prepare for their inventory. (Canela E-mail, ECF No. 46-9.) Rector contacted Tunstall and her cousin, Kyrin Hill, and assigned them the roles at DSG. (Tunstall Dep. Tr. 28:1-14, ECF No. 46-6.)

Tunstall and Hill accepted the offer and reported to the warehouse on June 23, 2015. (*Id.* at 30:23; 31:1-7.) They first met with Canela, who asked them if they had any experience lifting and moving furniture. (*Id.* at 31:12-17.) They replied that they did, and Canela left to obtain materials for Tunstall and Hill to begin working with. (Canela Dep. Tr. 31:17-25, ECF No. 51-2.) When Canela returned, she told Tunstall and Hill that her supervisor, Jerry Williams, instructed her to send them back to the temp agency. (*Id.* at 33:5.) Canela told the women that Williams stated "it might be too much heavy lifting. If you look, there's a lot of furniture, and it's a lot of heavy lifting, so he doesn't feel that it's going to work out." (*Id.* at 34:16-22.)

Canela and Williams have different recollections of what transpired between them when the decision was made to send Tunstall and Hill home. Canela testified that Williams approached her as she was retrieving materials and asked, "are those the two temps that we requested?" (*Id.* at 32:24-45.) Canela told him that yes, they were, and Williams said: "Tell them it's too much heavy lifting. It's not going to work out for them." (*Id.* at 34:2-4.) Williams, on the other hand, remembers Canela as the one approaching him regarding Tunstall and Hill's ability to perform the job. (Williams Dep. Tr. 38:1-4, ECF No. 51-3) ("I believe when she approached me out on the floor with this situation, she expressed concerns about them being able to do the job.")

2

Williams then "turned and looked" at the women, (*Id.* at 39:9-13), and concluded that they "just didn't look like they could physically handle the heavy lifting." (*Id.* at 33:6-8.)  Williams also noted that "they seemed to be fairly petite ladies." (*Id.* at 27:22.) Lastly, Williams testified: "It didn't appear that they were dressed appropriate to be in a warehouse lifting and wrapping furniture." (*Id.* at 40:14-16.)  But when asked what Tunstall and Hill were wearing, Williams stated that he did not remember (*Id.* at 41:10-11.)

Tunstall testified that Canela also told her and Hill, "This is men's work.  This is a man's job . . . [t]here's only men working out here.  I'm the only supervisor, and this is men's work." (Tunstall Dep. Tr. 36:13-17, ECF No. 46-6.)  She further speculated that Williams "probably said [it's men's work] to [Canela].  That's why he sent her to dismiss the position." (*Id.* at 43:19-20.)  Canela was asked in her deposition if Williams stated that the "two ladies wouldn't work out because it was man's work." (Canela Dep. Tr. 88:21-23, ECF No. 51-2.)  Canela replied: "I don't recall him saying man's work." (*Id.* at 88:24.)  Canela did not testify that she told Tunstall or Hill that the work was for men.  Williams was not asked, nor did he testify that he or Canela referred to the job as "man's work."

After Tunstall and Hill were dismissed, Tunstall asked Canela if there was any other work they could do. (Tunstall Dep. Tr. 36:14-15, ECF No. 46-6; Canela Dep. Tr. 34:24-25, ECF No. 51-2.)  Canela asked Williams, who stated "No . . . [j]ust send them back, and we'll let the agency know to send somebody different." (Canela Dep. Tr. 35:1-4, ECF No. 51-2.)

3

Tunstall and Hill contacted Kelly Services, who informed them that they had two other complaints "about that situation" and would look into it. (Tunstall Dep. Tr. 38:3-6, ECF No. 46-6.) Tunstall also contacted the Human Resources Department at DSG. (*Id.* at 45:1-2.) The first time she contacted HR, the representative told her they would file a complaint. (*Id.* at 46:11-12.) However, Tunstall called back the next day and was told "don't call back." (*Id.* at 46:13.)

Since being sent home from her assignment at DSG, Tunstall has received other positions through Kelly Services. (*Id.* at 15:12-17.) Tunstall worked at a Stericycle warehouse and Heartland Suites. (*Id.* 15:12-13.)

## II. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In considering a motion for summary judgment, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party," *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017), but the district court must also view the evidence "through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In this employment discrimination case, Tunstall bears the "substantive evidentiary burden," *Anderson*, 477 U.S. at 254, of proving by preponderance of the evidence a prima facie case of discrimination, *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). Thus, summary judgment for DSG is warranted if, viewed in the light most favorable to Tunstall, "the record as a whole could not lead a rational trier of fact" to find that Tunstall's gender caused Defendant to terminate or fail to hire Tunstall. *See Matsushita*, 475 U.S. at 587; *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017).

### III. Discussion

In considering a motion for summary judgment in an employment discrimination case, district courts should not sort evidence "into different piles, labeled 'direct' and 'indirect', that are evaluated differently. Instead, all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). *Ortiz* abrogated the distinction between direct proof and indirect proof but did not "displace[ ] the burden-shifting analysis established in *McDonnell Douglas*," which courts had formerly referred to as the "indirect" method of proof. *Ferrill*, 860 F.3d at 499.

Post-*Ortiz*, it's clear that the *McDonnell Douglas* framework is just a "means to consider whether one fact (here, [gender]) caused another (here, [termination or failure to hire])[.]" *Ortiz*, 834 F.3d at 763; *see also Loyd v. Philips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994) ("The expression 'prima facie case' in Title VII litigation popularly refers to a common, but not exclusive, method of establishing a triable issue of

5

intentional discrimination."). However, the ultimate question remains the same: whether a rational trier of fact could find that Tunstall's gender caused DSG to terminate and fail to hire her. *See Ortiz*, 834 F.3d at 764.

A. *Termination*

Tunstall presents her case for discriminatory termination in terms of (1) direct evidence, (2) evidence proving that DSG's legitimate reason for terminating Tunstall is pretextual, and (3) evidence as a whole. (Pl.'s Br. at 12-15, ECF No. 50.) First, Tunstall argues that Canela's statement, "this is men's work," constitutes direct evidence. (*Id.* at 13.) She also cites Williams' alleged bias against other women in the warehouse as direct evidence of discrimination. (*Id.*) Second, Tunstall argues that DSG's legitimate reason for sending her home, that she appeared unable to do the work, is pretext for gender discrimination. (*Id.* at 14.) She points to DSG's shifting reasons for terminating her assignment and argues that these reasons are unworthy of credence. (*Id.* at 14-15.) Lastly, in Tunstall's "evidence as a whole" section, she summarizes the above arguments.

The singular question for the Court is whether the evidence presented by Tunstall would permit a reasonable factfinder to conclude that that Tunstall's sex caused DSG to terminate her assignment. *See McDaniel v. Progress Rail Locomotive, Inc.*, — F.3d — 2019 WL 5057188 at *3 (7th Cir. 2019). In presenting evidence of discrimination, a plaintiff may but need not use the *McDonell Douglas* burden-shifting framework. *Id.* Under this approach, a plaintiff must show that: (1) she was a member of a pro-

tected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019). Once this showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). If the employer does so, the burden shifts back to the plaintiff to offer evidence suggesting that the explanation is pretext for discrimination. *Id.*

Tunstall does not attempt to prove a prima facie case of discriminatory termination under the *McDonnell Douglas* framework. Instead, she moves directly into an analysis of whether DSG's non-discriminatory reason for sending her home is pretextual. (Pl.'s Br. at 14, ECF No. 50.) However, the Seventh Circuit has long held that a plaintiff must first establish a prima facie case before showing that the employer's legitimate reason for termination was pretext for discrimination. *See, e.g., Jones v. Union Pac. R. Co.,* 302 F.3d 735, 741 (7th Cir. 2002) ("establishing a prima facie case . . . is a condition precedent to the pretext analysis"); *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997) ("we do not reach the pretext stage, however, unless the plaintiff gets over the 'legitimate expectations' [prong two of the prima facie case] hurdle"); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997) ("pretext analysis is necessary only if a plaintiff has already established a prima facie case."). In any case, Tunstall would be unable to establish a prima facie case of dis-

7

criminatory termination. She has not alleged nor presented any evidence that similarly situated employees outside her protected class, men who appeared unable to lift furniture without injuring themselves, were treated more favorably.

However, the *McDonnell Douglas* framework is just one means of determining whether Tunstall was discriminatorily terminated. For example, a plaintiff may point to the evidence as a whole to show discrimination. *See Ortiz,* 834 F.3d at 766. Looking cumulatively at all the evidence, the Court finds that there are several material facts in dispute, and that a reasonable trier of fact could conclude that Tunstall was dismissed because of her sex.

First, Tunstall's deposition testimony, in which she claims that Canela told her, "This is men's work. This is a man's job," is evidence of discriminatory animus. (Tunstall Dep. Tr. 36:13, ECF No. 46-6.) Although Canela does not remember Williams making a statement about 'men's work,' nor did she testify that she told Tunstall this, a reasonable fact finder could credit Tunstall's testimony. A dispute of material fact also exists as to whether Canela or Williams was the decisionmaker. *See Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 600 (7th Cir.2003) ("A decisionmaker is the person responsible for the contested decision.") For Canela's comments to prove a discriminatory motive on behalf of DSG, she would have had to have been the decisionmaker. *Id.*

Still, even if Canela were not the decisionmaker, an employer can be liable for discrimination if "a nondecision-maker performs an act motivated by discriminatory animus that is intended to cause an adverse employment action, and that act is a

8

proximate cause of the ultimate employment action." *Harris v. Warrick Cty. Sheriff's Dep't*, 666 F.3d 444, 448 (7th Cir.2012) (internal quotation marks and punctuation omitted) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). This "cat's paw" theory exists when the decisionmaker is persuaded to act based on another employee's bias towards the plaintiff. *See Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011) ("With sufficient evidence, we permit juries to draw an inference that another employee's impermissible bias infected a decision when a plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision").

There is sufficient evidence for a jury to find that Canela harbored a discriminatory bias against Tunstall which influenced the decision to dismiss her. Williams initially testified that he could not remember whether he or Canela made the decision to send Tunstall home, (Williams Dep. Tr. 22:5-7, ECF No. 51-3) ("I don't know if she made the decision, if she came to me, I don't remember the situation"), but he eventually states: "as I remember the conversation . . . [Canela's] saying they're not capable of doing the work, and then my comment would be, 'well, dismiss them, and let's get somebody that is [capable of doing the work].'" (*Id.* at 23:23-25; 24:1-4.) Williams' testimony permits the jury to infer that Canela, (who, according to Tunstall, stated that the job was 'men's work') told Williams that Tunstall was not capable of performing the work, and Williams decided they should be sent home.

Tunstall's second piece of evidence, Williams' alleged bias against other women in the warehouse, is not probative of discrimination. Tunstall claims that "Williams

9

treated other women differently due to their sex." (Pl.'s Br. at 13, ECF No. 50). While Tunstall does not cite to the record nor direct the Court to what evidence she is relying on, the Court assumes she intends to refer to Canela's deposition testimony. Canela recounts a time when Williams "hired someone he knew from before, Steven Kelter, . . . and gave him the same title that I had." (Canela Dep. Tr. 15:11-15, ECF No. 51-2.) Canela and the other managers, all of whom were males, "all kind of had an issue with" Williams. (*Id.* at 15:24-25; 16:1.) The other managers resigned before Canela did because they were tired of how Williams did not treat them as a team and was focused on his own plans and goals. (*Id.* 16:3-11.) When asked if Williams treated her differently from Kelter, Canela said: "Oh, yeah, he treated all of us." (*Id.* at 17:24.) "It was kind of like we were all against [Williams] kind of thing." (*Id.* at 46:13-14.)

This evidence does not tend to show that Williams harbored discriminatory animus against women, but merely that he favored his friend, Kelter. Canela also testified that she "felt [Williams] being a feminist, at times," but went on to define 'feminist' as, "somebody who cannot acknowledge a female taking control or being able to be capable of even managing or anything like that." (*Id.* at 15:3-15.) But this one conclusory statement by Canela is not enough to infer discriminatory animus on behalf of Williams.

Third, a material question of fact exists as to whether DSG's reasons for terminating Tunstall's assignment are pretext for discrimination. Although under the

10

*McDonnell Douglas* framework, the Court could not consider the issue of pretext before Tunstall established a prima facie case, this framework is not the exclusive method of analyzing a claim of discrimination. *See Ortiz*, 834 F.3d at 763. In considering the evidence as a whole, as instructed by the Seventh Circuit, *see id.* at 766, the Court will include pretext in its analysis. "An inference of discrimination may follow when the employer's purported nondiscriminatory reason for taking an adverse action against the employee was pretextual, meaning it was a lie or a phony reason." *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 561 (7th Cir. 2019) (internal quotations omitted) (quoting *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015)). To prove pretext, Tunstall must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in DSG's stated reasons for its allegedly discriminatory actions "that a reasonable person could find [them] unworthy of credence." *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 561 (7th Cir. 2019) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 852-53 (7th Cir. 2012)).

DSG has offered several different explanations for why it terminated Tunstall's assignment. On August 5, 2015, Williams gave a written statement to DSG's HR Department, which explained that he was concerned "about [Tunstall and Hill] being able to do the assignment without getting injured because of the lifting." (Williams' First St. at 2, ECF No. 46-2.) On September 23, 2015, he gave another statement in which he said that Tunstall and Hill "didn't even appear to be dressed to work in the warehouse. They didn't have an 'engaged' or 'ready to work' appearance in the way they were displaying their demeanor." (Williams' Second St. at 2, ECF No. 46-2.) On

11

March 25, 2016, DSG responded, through counsel, to Tunstall's Indiana Civil Rights Commission Charge. (ECF No. 46-4.) It stated that Tunstall and Hill were both wearing "heels, large hoop earrings, and dressy clothing that was unsuitable for moving and lifting furniture." (ICRC Resp. at 2, ECF No. 46-4.). On April 4, 2019, Williams was asked in his deposition how the women were dressed. (Williams Dep. Tr. At 20:7, ECF No. 51-3.) He replied that he had "heard about a dress issue. I couldn't tell you. Today, I couldn't tell you how they were dressed." (*Id.* at 20:8-10.) He stated that the only time he saw Tunstall and Hill was when they were leaving the building, (*id.* at 21:17), yet he later testified that before he spoke with Canela, he saw Tunstall and Hill "at the end of the building." (*Id.* at 22:16-19.) When asked why he thought the women could not do the work without getting hurt, Williams said "they seemed to be fairly petite ladies." (27:18-22.)

DSG argues that the reason Tunstall was dismissed was because Williams was concerned about her inability to safely lift heavy furniture. (Def.'s Br. at 11, ECF No. 45.) However, Williams has offered three different reasons for making the determination that Tunstall could not lift the furniture: because she was petite, she was not dressed appropriately, and because she did not have a 'ready to work' attitude. A reasonable jury could conclude that DSG's evolving explanations support an inference of pretext. *See Castro v. DeVry Univ., Inc.,* 786 F.3d 559, 577 (7th Cir. 2015) ("As a general rule, a reasonable trier of fact can infer pretext from an employer's shifting or inconsistent explanations.").

In addition to the shifting explanations for terminating Tunstall's assignment, much of Williams' reasoning is disputed by the record. A reasonable trier of fact could find that Tunstall, who is 5'6" and 191 pounds, (Tunstall Second Aff. ¶ 3, ECF No. 51-9), and Hill, who is 6'2" and 250 pounds, (Hill Decl. ¶ 3, ECF No. 51-7), are not 'petite ladies.' Further, Canela testified that she does not remember what Tunstall was wearing, but she "would have caught it if they were wearing something that I would think is not right." (Canela Dep. Tr. at 61:8-9, ECF No. 51-2.) She also added that she wears large hoop earrings to work. (*Id.* at 62:6-13.) Lastly, there is evidence that Tunstall was, in fact, 'ready to work.' Canela testified that after Tunstall was dismissed, she came back and asked: "Is there anything? Can you ask him if we could if they need to clean bathrooms?" (*Id.* at 35:16-20.) Tunstall also asked if she could do cardboard or maintenance. (*Id.* at 35:22-25.) Canela added: "I mean, they offered. They really needed a job." (*Id.* at 19-20.)

A reasonable trier of fact could conclude that, based on Canela's statement that the work was for men, DSG's evolving explanations for dismissing Tunstall, and the implausibility of DSG's explanations, that Tunstall was terminated because of her gender. *See Ortiz*, 834 F.3d at 764.

Yet, DSG argues that terminating Tunstall's temporary assignment is not an adverse action. (Def.'s Br. at 10, ECF No. 45.) The only authority DSG relies on is a 1997 case from the Middle District of North Carolina, which found that ending a temporary assignment is an "expected, customary part of an employee's job." *Mullis v. Mechanics & Farmers Bank*, 994 F. Supp 680, 686 (M.D.N.C. 1997). But, the Seventh

13

Circuit has interpreted 'adverse action' more broadly. *See Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012). Tunstall was sent home and was unable to work, and therefore was not paid for the day, similar to an unpaid administrative leave. *See Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (a suspension without pay . . . would constitute an adverse employment action.) Actions that cause economic injuries and materially alter the terms and conditions of the employment are adverse. *Id.* at 647.

*B. Failure to Hire*

Tunstall also alleges that she was discriminated against because DSG failed to hire her for a permanent position. (Compl. ¶¶ 5-15, ECF No. 1.) Tunstall dedicates only one paragraph to this claim and does not cite any legal authority, nor does she set out a framework for the Court to analyze her failure to hire claim. (Pl.'s Br. at 17, ECF No. 50.) Because DSG uses the *McDonnell Douglas* framework to analyze this claim, the Court will do so as well. (Def.'s Br. at 14, ECF No. 45).

Under the *McDonnell Douglas* framework, a plaintiff establishes a prima facie case of discriminatory failure to hire by showing that (1) she was a member of a protected class; (2) she was qualified for and applied for an open position; (3) she was rejected; and (4) the position remained open or the employer hired someone with her qualifications outside the protected class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 413 (7th Cir. 2018). Tunstall has not presented any evidence showing that she applied for a permanent position at DSG.

14

And even if she had, Tunstall was not qualified for this position. The position, a Distribution Center Associate, requires a high school diploma, (Chapell Decl., Ex. B, ECF No. 46-8), and Tunstall testified that she had received neither a high school diploma nor GED. (Tunstall Dep. Tr. 53:2-5, ECF No. 46-6.) Tunstall's brief merely concludes that she "was qualified to perform the tasks." (Pl.'s Br. at 17, ECF No. 50.) But on a motion for summary judgment, plaintiffs must "go beyond the pleadings and designate specific facts showing that there is a genuine issue at trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 896 (7th 2018). Because Tunstall has failed to prove that she applied for the position and additionally failed to prove that she was qualified for the position, she cannot make out a case for discriminatory failure to hire and there is no need to address the other prongs of the *McDonnell Douglas* framework. No reasonable trier of fact could find that Tunstall was not hired based on her gender. Therefore, summary judgment on Tunstall's failure to hire claim is proper.

### IV.   Conclusion

For the reasons stated above, DSG's motion for summary judgment (ECF No. 44) is **granted in part** and **denied in part**. Summary judgment is **granted** as to Tunstall's failure to hire claim. Summary judgment is **denied** as to Tunstall's termination claim and trial will proceed on this claim only.

**SO ORDERED**.

Date: 11/7/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution by CM/ECF to registered counsel of record.